[No. H032842. Sixth Dist. Apr. 7, 2009.]

In re P.F. LAZOR on Habeas Corpus.

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill, Anya M. Binsacca and Denise A. Yates, Deputy Attorneys General, for Petitioner State of California.

Sanders & Associates and Steven C. Sanders for Respondent P.F. Lazor.

## OPINION

**ELIA, J.**—By decision dated February 23, 2006, California's Board of Parole Hearings (Board) denied parole to P.F. Lazor, who was serving an indeterminate term of 17 years to life for a 1983 second degree murder conviction with a firearm enhancement. In a petition for writ of habeas corpus filed in the superior court, Lazor (hereinafter petitioner) challenged the Board's decision, alleging in part that the decision was without evidentiary support and the Board's reasons for denying parole had no nexus to public safety.

The superior court issued an order to show cause (OSC) after examining the Court of Appeal opinion affirming the murder conviction[1] and finding that "[t]he facts of the crime reveal a fair case for imperfect self defense." The OSC stated: "While Petitioner's imperfect self defense case was not sufficiently strong such that the murder conviction was avoided, it is certainly strong enough such that Petitioner's crime does not appear to be in any way aggravated." It indicated that the murder appeared unexceptional and directed respondent custodian to explain why the crime was exceptional.

Following the filing of the return and the traverse and without ordering any evidentiary hearing, the superior court issued an order directing the Board to conduct a new parole suitability hearing and to proceed in accordance with due process. The superior court's order stated in part: "As outlined in the Order to Show Cause, this Court questioned the Board's use of the crime itself to deny parole. Respondent has not addressed those concerns and has not supported the Board's actions in this regard. Accordingly, the Board may not invoke unsuitability factor 2402(c)(1) [of title 15 of the California Code of Regulations] in Petitioner's case unless different evidence is presented."[2] The superior court did not reach the validity of the disciplinary record, stating: "Regarding Petitioner's allegation that the Board used invalid 115s and 128s against him, this is not a matter that can be properly resolved in this petition. Petitioner must exhaust his administrative remedies . . . ." M. Martel, acting warden at Mule Creek State Prison, appeals from the trial court's order. (See Pen. Code, § 1507.)[3]

---

[1] We take judicial notice of the Court of Appeal opinion *People v. Lazor* (Oct. 28, 1985, A024654) (nonpub. opn.). (Evid. Code, §§ 452, subd. (d), 459.)

[2] All further regulatory references are to the California Code of Regulations (hereinafter Regulations or Regs.).

[3] All further statutory references are to the Penal Code unless otherwise specified.

By order dated May 7, 2008, this court granted appellant's petition for a writ of supersedeas and stayed enforcement of the trial court's order until final determination of this appeal. We consider whether the Board improperly denied parole and whether the deferential "some evidence" standard was satisfied.

A. *Review of Parole Decision on Appeal from Order Granting Habeas Corpus Relief*

"[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law . . . ." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658 [128 Cal.Rptr.2d 104, 59 P.3d 174].) "[T]he judiciary is empowered to review a decision by the Board or the Governor to ensure that the decision reflects 'an individualized consideration of the specified criteria' and is not 'arbitrary and capricious.' ([*In re Rosenkrantz, supra*, 29 Cal.4th] at p. 677.)"[4] (*In re Lawrence* (2008) 44 Cal.4th 1181, 1205 [82 Cal.Rptr.3d 169, 190 P.3d 535].) The "some evidence" standard of review is applicable to judicial review of a Board's or Governor's parole decision. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1254 [82 Cal.Rptr.3d 213, 190 P.3d 573]; *In re Lawrence, supra*, 44 Cal.4th at pp. 1191, 1212, 1224; *In re Rosenkrantz, supra*, 29 Cal.4th at pp. 625, 652, 667, 677.)

When a superior court grants relief on a petition for habeas corpus without an evidentiary hearing, as happened here, the question presented on appeal is a question of law, which the appellate court reviews de novo. (*In re Zepeda* (2006) 141 Cal.App.4th 1493, 1497 [47 Cal.Rptr.3d 172].) A reviewing court independently reviews the record if the trial court grants relief on a petition for writ of habeas corpus challenging a denial of parole based solely upon documentary evidence. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

B. *Facts and History*

Petitioner appeared before the Board on February 23, 2006, for a parole consideration hearing. The Board read the description of the crime contained in a life prisoner evaluation report, which was based upon the probation

---

[4] A Governor's review of a parole decision pursuant to article V, section 8, subdivision (b), of California's Constitution is "limited to the same considerations that inform the Board's decision" and "the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision. [Citations.]" (*In re Rosenkrantz, supra*, 29 Cal.4th at pp. 661, 660.)

officer's report. According to the report, petitioner had been having a disagreement with the victim and the victim's uncle regarding the ownership of and rental agreements concerning a property owned by the victim's uncle, and the uncle had directed petitioner to vacate the premises. The offense occurred when the victim arrived at the residence where petitioner was apparently removing his personal property and the victim, angered at the petitioner's presence, forcibly entered the room where petitioner was talking on the phone. Petitioner asked the person on the line to call the police. Petitioner shot the victim multiple times and subsequently called the police himself. Petitioner told the probation officer that he had no choice but to shoot the victim and his actions were taken in self-defense.

At the parole consideration hearing, petitioner asserted the victim had threatened him with a meat cleaver and he panicked but he did not intend to shoot the victim.[5] Petitioner discussed his responsibility for the shooting and expressed remorse but maintained he had acted in the belief he needed to defend himself. He told the panel that the shooting was a "spontaneous reaction to save [himself] under fear and panic." Petitioner acknowledged there had been five shots expelled during the incident and there had been testimony at trial regarding wounds from a bullet entering the right eyebrow, a bullet entering the back of the victim's head, and two bullets entering the victim's back.[6] He recalled accurately testifying at trial that he had initially fired at the victim and the victim went down and appeared to be definitely disabled.

The Board considered petitioner's behavior in prison. Petitioner had received 27 counseling memoranda reflecting a pattern of not obeying rules, one as recent as June 10, 2005, and 35 rules violations reports, one as recent as December 20, 2004.[7] Petitioner discussed the December 2004 rules

---

[5] The Court of Appeal opinion (A024654) makes no reference to a meat cleaver and petitioner claimed at trial that he saw the victim with a gun as the door opened. Petitioner told the hearing panel, "I've always talked about the meat cleaver as being the main thing, but it didn't appear to be the main thing in trial because they wouldn't let me raise it because they said that the police had destroyed it."

[6] The Court of Appeal opinion (A024654) indicated that autopsy evidence showed the victim suffered five bullet wounds inflicted from a bullet entering above his right eyebrow, a second bullet entering the back of his head, a third bullet entering his upper left back area, a fourth bullet entering his back at a lower location than the entry point of the third bullet, and a fifth bullet entering the back of his right hand.

[7] A rules violation report on CDC Form 115 documents inmate misconduct that is "believed to be a violation of law" or "not minor in nature." (Regs., tit. 15, § 3312, subd. (a)(3).) A "Custodial Counseling Chrono" on CDC Form 128-A documents recurring minor misconduct or minor misconduct meriting documentation and the counseling provided. (Regs., tit. 15, § 3312, subd. (a)(2).) Minor misconduct handled by verbal counseling that achieves corrective action requires no written report. (Regs., tit. 15, § 3312, subd. (a)(1).)

violation for falsification of records or documents and circumvention of mail procedures and a June 2000 rules violation for theft of state food. Petitioner's last violation for fighting was in 1997.

The Board reviewed the December 15, 2005 psychological report. Petitioner was diagnosed with personality disorder, NOS (not otherwise specified), with narcissistic and paranoid traits. The evaluating psychologist stated that petitioner's thinking patterns indicated a paranoid orientation toward the world and petitioner had portrayed himself as the victim and had difficulty accepting responsibility for his role in his problems. According to the psychologist, petitioner had an explanation for everything and refused to accept any responsibility for his disciplinary problems.[8] As to the commitment offense, petitioner had denied shooting the victim in the back.[9] The psychologist found it difficult to assess the extent to which petitioner had explored the commitment offense and come to terms with its underlying causes because the petitioner's version of the crime was so different from the district attorney's and petitioner continued to maintain he acted in self-defense and did not commit a crime. The psychologist recommended that the Board assess the veracity of petitioner's assertions. The psychologist believed that petitioner's main difficulties arose from his personality disorder. Nevertheless, the psychologist concluded that the various factors related to petitioner's risk for violence put petitioner in the low risk category for violence if paroled.[10]

The officer who had investigated the commitment offense and the deputy district attorney opposed release on parole because, in their opinion, petitioner still posed a risk to the public. The deputy district attorney considered petitioner's claim of self-defense to be inconsistent with having shot the victim in the back a number of times and believed petitioner lacked insight into the crime.

---

[8] The report indicates that petitioner had told the psychologist that, if he had the chance to appeal his 115's to the warden, all of them would be dismissed.

[9] In the traverse, petitioner "specifically denie[d] shooting the victim in the back." This additional factual allegation does not expand the scope of the habeas corpus proceeding beyond the claims "the court initially determined stated a prima facie case for relief." (*In re Clark* (1993) 5 Cal.4th 750, 781, fn. 16 [21 Cal.Rptr.2d 509, 855 P.2d 729].)

[10] The psychologist relied upon the following suitability factors: petitioner's age and length of incarceration, absence of any history of arrests for violence or any criminal history other than the commitment offense, the absence of any disciplinary infractions for fighting since 1997, strong family bonds, and successful participation in work and self-help programs while incarcerated.

On February 23, 2006, the Board found petitioner unsuitable for parole because he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. In reaching its decision, the Board referred to the circumstances of the commitment offense, finding that it was carried out in a cruel and callous manner, and the fact that petitioner had numerous "CDC 115s" and numerous "128 counseling chronos." The panel mentioned that the victim was "shot with a .45 caliber handgun" and suffered "four wounds to the head and chest."

The Board recognized that petitioner had telephoned for emergency help for the victim after the shooting and petitioner had no prior criminal record. The Board found petitioner's parole plans to be very solid and he had a marketable skill and acceptable employment and residential plans. Petitioner was commended for his continued participation in self-help programming, including stress management and anger management. The Board nevertheless concluded that petitioner continued to need self-help to face, discuss, understand, and cope with stress and conflict in a nondestructive manner and petitioner continued to be unpredictable and a threat to others until progress was made. It noted a contradiction in his history and behavior with some of the positive steps he had taken.

C. *Review of Board's Decision Denying Parole*

1. *Clarification of "Some Evidence" Standard of Review by* Lawrence *and* Shaputis

██ Section 3041, subdivision (b), requires a parole release date to be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Italics added.) "[A]s set forth in the governing regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole."[11] (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 654.)

---

[11] "Title 15, section 2402 . . . provides parole consideration criteria and guidelines for murders committed on or after November 8, 1978." (*In re Lawrence, supra,* 44 Cal.4th at pp. 1201–1202, fn. 5; see Regs., tit. 15, § 2400.) Regulations, title 15, section 2402, subdivision (c), states that "[c]ircumstances tending to indicate unsuitability include: [¶] (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which

Prior to the recent cases of *In re Lawrence, supra*, 44 Cal.4th 1181 and *In re Shaputis, supra*, 44 Cal.4th 1241, the California Supreme Court had articulated a "some evidence" standard of review that authorized a court to grant habeas corpus relief from a parole decision denying parole where the factual basis of such decision was not supported by some evidence in the record. (*In re Rosenkrantz, supra*, 29 Cal.4th at pp. 658, 667, 670.) The court had determined that "[w]hen the Board bases unsuitability on the circumstances of the commitment offense, it must cite 'some evidence' of aggravating facts *beyond the minimum elements of that offense. (Rosenkrantz, supra*, 29 Cal.4th 616, 658, 683.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1095, fn. 16 [23 Cal.Rptr.3d 417, 104 P.3d 783].) The court observed in *Rosenkrantz*: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 683.)

The court found in *Rosenkrantz* that the Governor "properly could consider the nature of the offense," which involved "particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 683.) Subsequently, in *Dannenberg*, the court held that "the Board proceeded lawfully when" it found Dannenberg

---

demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense. [¶] (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age. [¶] (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others. [¶] (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim. [¶] (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense. [¶] (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." Regulations, title 15, section 2402, subdivision (d), states that "[c]ircumstances tending to indicate suitability include: [¶] (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims. [¶] (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others. [¶] (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense. [¶] (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time. [¶] (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization. [¶] (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime. [¶] (7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

unsuitable for parole "by pointing to some evidence that the particular circumstances of his crime—circumstances beyond the minimum elements of his conviction—indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remain[ed] a danger to public safety." (*In re Dannenberg, supra,* 34 Cal.4th at p. 1098.)

■ In *Lawrence,* the court discarded the minimum elements test, expressing its realization that "the minimum elements inquiry is unworkable in practice" since "there are few, if any, murders that could *not* be characterized as either particularly aggravated, or as involving some act beyond the minimum required for conviction of the offense." (*In re Lawrence, supra,* 44 Cal.4th at p. 1218; see *id.* at p. 1220.) The court clarified that "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense" and a parole decision is not "dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense." (*Id.* at p. 1221.)

The Supreme Court further explained that a parole decision "is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [Citations.]" (*In re Lawrence, supra,* 44 Cal.4th at p. 1221.) "[U]nder the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Id.* at p. 1212.) "[A]s specified *by statute,* current dangerousness is the fundamental and overriding question for the Board and the Governor." (*Id.* at p. 1213.)

■ As to judicial review of a parole decision, "because the core statutory determination entrusted to the Board and the Governor is whether the inmate poses a current threat to public safety, the standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." (*In re Lawrence, supra,* 44 Cal.4th at p. 1191.) "[W]hen a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate

constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings. [Citations.]" (*Id.* at p. 1212.)

The governing statute requires the Board to consider and rely upon "evidence in the record corresponding to both suitability and unsuitability factors—including the facts of the commitment offense, the specific efforts of the inmate toward rehabilitation, and, importantly, the inmate's attitude concerning his or her commission of the crime, as well as the psychological assessments contained in the record . . . ." (*In re Lawrence, supra,* 44 Cal.4th at p. 1213.) "By reviewing this evidence, a court may determine whether the facts relied upon by the Board . . . support the ultimate decision that the inmate remains a threat to public safety." (*Ibid.*)

*Lawrence* reconfirmed that judicial review of parole decisions is deferential, stating that its "clarification that the 'some evidence' standard of review focuses upon evidence supporting the core statutory determination of public safety does not alter [its] recognition in *Rosenkrantz* and *Dannenberg* that the [parole] decisions of both the Board and the Governor are entitled to deference." (*In re Lawrence, supra,* 44 Cal.4th at p. 1191, fn. 2; see *In re Dannenberg, supra,* 34 Cal.4th at p. 1095, fn. 16 [Board's broad parole discretion with deferential judicial oversight does not violate due process]; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 665 ["the 'some evidence' standard is extremely deferential . . ."].) "Resolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 656.) The deferential "some evidence" standard of review requires only a "modicum of evidence" of unsuitability for parole. (See *In re Lawrence, supra,* 44 Cal.4th at p. 1226; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

## 2. *Superior Court's Analysis*

■ Several serious flaws appear in the superior court's legal analysis. First, the superior court erred to the extent that it substituted its own view of the gravity and circumstances of the commitment offense for the Board's.[12] A

---

[12] The Court of Appeal opinion (A024654) stated that petitioner's primary defense at trial was self-defense. The trial court instructed regarding murder, voluntary manslaughter based on unreasonable self-defense, and reasonable self-defense. "For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. (*People v. Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1] . . . .) A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide. (§ 197; *People v. Anderson* (2002) 28 Cal.4th 767, 782 [122 Cal.Rptr.2d 587, 50 P.3d 368] . . . .)" (*People v. Randle* (2005) 35 Cal.4th 987, 994 [28 Cal.Rptr.3d 725, 111 P.3d 987].) "California law recognizes the doctrine of imperfect self-defense, under which a defendant who kills with an actual but unreasonable belief in the need

court may not substitute its judgment for the Board's merely because it would weigh the evidence differently. (See *In re Rosenkrantz, supra*, 29 Cal.4th at p. 677 ["the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion" of the Board and the Governor and "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole"]; see also *In re Shaputis, supra*, 44 Cal.4th at p. 1260 [quoting *Rosenkrantz*].)

Second, as clarified in *In re Lawrence* and *In re Shaputis*, the propriety of the parole decision did not depend upon whether the commitment offense was an exceptional murder. The Supreme Court has made it clear that "the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. (*Dannenberg, supra*, 34 Cal.4th at pp. 1083–1084, 1095.)" (*In re Lawrence, supra*, 44 Cal.4th at p. 1221; see *In re Shaputis, supra*, 44 Cal.4th at p. 1254.) "Focus upon whether a petitioner's crime was 'particularly egregious' in comparison to other murders in other cases is not called for by the statutes, which contemplate an individualized assessment of an inmate's suitability for parole . . . ." (*In re Lawrence, supra*, 44 Cal.4th at p. 1217.) The determination of current dangerousness does not depend "solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense." (*In re Shaputis, supra*, 44 Cal.4th at p. 1254.)

Third, the court should not have restricted the Board's future exercise of discretion. (See *In re DeLuna* (2005) 126 Cal.App.4th 585, 599 [24 Cal.Rptr.3d 643].) The circumstances of the murder, whether or not exceptional or especially cruel or callous, must be considered in light of other facts in the record, including "changes in the inmate's psychological or mental attitude. [Citations.]" (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.)

3. *Application of "Some Evidence" Standard*

We review the parole decision under the "some evidence" standard. "[T]he relevant inquiry for a reviewing court is not merely whether an inmate's

---

for self-defense is not guilty of murder but may be guilty of manslaughter." (*People v. Martinez* (2003) 31 Cal.4th 673, 705 [3 Cal.Rptr.3d 648, 74 P.3d 748].) "[W]hen a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury, the doctrine of 'imperfect self-defense' applies to reduce the killing from murder to voluntary manslaughter. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664 [80 Cal.Rptr.3d 126, 187 P.3d 970].) The jury rejected all theories related to self-defense. The appellate court rejected a claim of prosecutorial misconduct as harmless, stating "defense evidence of self-defense was not substantial."

crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.) As we have stated, the "relevant inquiry" for a reviewing court "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings. [Citations.]" (*Id.* at p. 1212.)

"[T]o give meaning to the statute's directive that the Board *shall normally* set a parole release date (§ 3041, subd. (a)), a reviewing court's inquiry must extend beyond searching the record for some evidence that the commitment offense was particularly egregious and for a mere *acknowledgement* by the Board or the Governor that evidence favoring suitability exists. Instead, under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*In re Lawrence, supra*, 44 Cal.4th at p. 1212.)

"[T]he Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.]" (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.) "In some cases, . . . the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." (*Id.* at p. 1191.) "[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain

probative to the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214.) On the other hand, "the unexceptional nature of the commitment offense will not inevitably reflect a *lack* of current dangerousness without due consideration of the inmate's postconviction actions and progress toward rehabilitation." (*Id.* at p. 1218.)

The Board must consider all relevant factors when evaluating an inmate's suitability for parole. (*In re Lawrence, supra,* 44 Cal.4th at pp. 1191, 1219; see Regs., tit. 15, § 2402, subd. (b) ["All relevant, reliable information available to the panel shall be considered in determining suitability for parole"].) The factors for determining parole suitability set forth in the Regulations are not exclusive. (See Regs., tit. 15, § 2402, subds. (c) ["The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel."], (d) ["The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel."].) "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., tit. 15, § 2402, subd. (b).)

"[I]n determining whether further incarceration is necessary to protect the public, the Board (and the Governor) must consider, among other factors, whether the inmate exhibits signs of remorse, has made realistic plans for release or has developed marketable skills that can be put to use upon release, and whether the inmate's institutional activities reflect an enhanced ability to function within the law upon release. [Citation.] Moreover, the Board must consider the inmate's past and present mental state and past and present attitude toward his or her crime. [Citation.] These suitability factors clearly establish that the statutes contemplate the consideration of an inmate's rehabilitation as an integral element of a parole suitability determination, and that a determination of the current threat posed by an inmate necessarily involves consideration of the inmate's postconviction conduct and mental state as it relates to his or her *current* ability to function within the law if released from prison." (*In re Lawrence, supra,* 44 Cal.4th at p. 1220, fn. 19; see Regs., tit. 15, § 2402, subds. (b) [relevant information includes inmate's "past and present mental state" and "past and present attitude toward the crime"], (d)(3) [circumstances tending to show suitability include signs of remorse and indications inmate "understands the nature and magnitude of the offense"].)

An inmate's lack of insight into, or minimizing of responsibility for, previous criminality, despite professing some responsibility, is a relevant consideration.[13] (See *In re Shaputis, supra*, 44 Cal.4th 1241, 1260–1261.) Postconviction institutional behavior bears on a parole decision. (See Regs., tit. 15, § 2402, subds. (c)(6) ["serious misconduct in prison or jail" is a circumstance tending to show unsuitability], (d)(9) [institutional activities indicating "an enhanced ability to function within the law upon release" is a circumstance tending to show suitability].) An inmate's lack of insight into, or downplaying of, continuing disciplinary problems, even if not involving violence, may be relevant to the ultimate determination of whether an inmate will be able to function within the law upon release or is currently dangerous.

A psychological evaluation of an inmate's risk of future violence is information that also "bears on the prisoner's suitability for release" (Regs., tit. 15, § 2402, subd. (b)) but such assessment does not necessarily dictate the Board's parole decision. It is the Board's job to assess current dangerousness and parole must be denied to a life prisoner "if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Regs., tit. 15, § 2402, subd. (a).)

■ "[I]n directing the Board to consider the statutory factors relevant to suitability, many of which relate to postconviction conduct and rehabilitation, the Legislature explicitly recognized that the inmate's threat to public safety could be minimized over time by changes in attitude, acceptance of responsibility, and a commitment to living within the strictures of the law." (*In re Lawrence, supra*, 44 Cal.4th at p. 1219; see *id.* at pp. 1199 [according to examining psychologist, "petitioner had demonstrated substantial insight and understanding into her life and the circumstances that led her to commit the crime . . ."], 1227 [record "replete with evidence establishing petitioner's rehabilitation, insight, remorse, and psychological health, and devoid of any evidence supporting a finding that she continues to pose a threat to public safety"].) Thus, in *Lawrence*, the commitment offense was "an isolated incident, committed while petitioner was subject to emotional stress that was unusual or unlikely to recur." (*In re Shaputis, supra*, 44 Cal.4th at p. 1259.) Conversely, "the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense" where an "inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse . . . ." (*In re Lawrence, supra*, 44 Cal.4th at

---

[13] Consideration of whether an inmate accepts responsibility for the commitment offense does not conflict with section 5011, subdivision (b), which provides that the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." (See *In re Elkins* (2006) 144 Cal.App.4th 475, 493–494 [50 Cal.Rptr.3d 503].)

p. 1228; see *In re Shaputis, supra*, 44 Cal.4th at p. 1261 [gravity of offense, lack of insight, and failure to accept responsibility outweighed factors favoring parole].) The Board has authority "to identify and weigh only the factors relevant to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts.' (*Rosenkrantz, supra*, 29 Cal.4th at p. 655.)" (*In re Lawrence, supra*, 44 Cal.4th at pp. 1205–1206.)

In support of its decision in this case, the Board's referred to circumstances of the commitment offense, which it stated was carried out in a cruel and callous manner, the need for petitioner to engage in additional self-help programming to understand and cope with stress and conflict in a nondestructive way because otherwise he continued to be unpredictable and a threat to others, and the numerousness of his disciplinary 115's, including one in 2004 and one in 2000, that petitioner had accumulated over the years. It did not expressly indicate that it was relying upon the mental health evaluation that had diagnosed defendant with personality disorder, NOS, with narcissistic and paranoid traits and it did not refer to the psychological evaluation stating that petitioner had refused to accept any responsibility for his disciplinary problems and he had an explanation for everything. The decision did not identify as factors petitioner's lack of insight and failure to meaningfully understand and accept responsibility for his behavior in regard to the commitment offense and subsequent behavior.

In short, the Board's decision identified immutable factors, the commitment crime and past disciplinary problems, but it did not expressly rely upon petitioner's lack of insight or ability to conform his behavior to the law upon release and failed to relate the identified immutable factors to circumstances that would make them probative of petitioner's current dangerousness. (See *In re Shaputis, supra*, 44 Cal.4th at pp. 1260–1261 [decision must reflect "*due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards"].) "[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness . . . ." (*In re Lawrence, supra*, 44 Cal.4th at p. 1214.) "[M]ere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Id.* at p. 1227.) Immutable facts, such as the circumstances of the commitment offense and disciplinary history, may be relied upon but must be related to the ultimate determination of current dangerousness. (See *id.* at p. 1221.) " '[D]ue consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Id.* at p. 1210.)

### D. *Disposition*

The trial court's order that directs the Board to conduct a new parole suitability hearing and to proceed in accordance with due process is modified to direct the Board to reconsider petitioner's parole suitability in light of *In re Lawrence, supra,* 44 Cal.4th 1181 and *In re Shaputis, supra,* 44 Cal.4th 1241 and is further modified to omit all restrictions upon the Board's full exercise of its discretion under law. As modified, the order is affirmed. The court is directed to forward a copy of the order as modified to the Board.

Rushing, P. J., and Premo, J., concurred.